**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NORTH DAKOTA**

In Re:                                                  Bankruptcy No. 17-30536

Wayne A. Gapp,
f/d/b/a Farming (EIN: 45-0428251)                       Chapter 7

        Debtor.

_____/

Gene W. Doeling, as Bankruptcy Trustee,

        Plaintiff,

        v.                                   Adversary No. 18-07009

Wayne A. Gapp,

        Defendant.

_____/

**MEMORANDUM AND ORDER**

## I.    INTRODUCTION

Gene W. Doeling, Chapter 7 Trustee, filed a Complaint seeking denial of Debtor/Defendant Wayne A. Gapp's discharge under 11 U.S.C. §§ 727(a)(2) and (4).  In his Complaint, Trustee alleges that Debtor transferred $29,465.80 from the sale of a home in Arizona to his non-filing spouse with the intent to hinder, delay or defraud creditors.[1] The Trustee also alleges Debtor knowingly and fraudulently made false oaths in connection with his bankruptcy case by undervaluing certain assets and failing to disclose certain assets and transfers on his bankruptcy schedules and statement of financial affairs ("SOFA").

---

[1] In his posttrial brief, the Trustee clarifies that the basis for his claim is "Debtor's transfer of his one-half interest in the sales proceeds from the sale of the Arizona residence to his non-filing spouse."  Doc. 27 at 4.

Debtor filed an Answer to the Complaint, asserting that the proceeds from the sale of the Arizona Property were derived from the one-half interest of his non-filing spouse, and therefore, the sale of the property did not result in a transfer from Debtor to his spouse.  Doc. 4.  Debtor denies that he intentionally undervalued assets.  Doc. 4.  He also denies that he omitted any assets or transfers with intent to hinder, delay or defraud creditors.  Doc. 4.

For the following reasons, the Court finds in favor of the Trustee and denies Debtor a discharge under section 727(a)(2)(A).

## II.   BACKGROUND

### A.   Debtor's Farming Operation and Financial Difficulties

From 1980 to 2016, Debtor worked as a self-employed crop farmer.  He farmed with his father for twelve years before taking over the family farm.  Debtor's son, Colton, began working with him on the family farm in 2011.  Debtor was primarily responsible for making decisions about the farm operations, including which crops to grow, the types of inputs to use and applying for government programs.  At the height of his operation, Debtor farmed 4,500 acres.  Debtor ceased operating his farm in 2016.  At the time of trial, Debtor worked for Meyer's Farm.[2]

In 2014, Debtor began to feel the effects of a depressed farm economy. Commodity prices fell, the cost of inputs rose and Debtor struggled to make the farm cash flow.  These economic trends and Debtor's corresponding financial difficulties continued into 2016.

---

[2] Debtor described his employment as "truck driver" for Columbia Grain, Inc., on schedule I. Ex. T-2, T-0042. By the time of trial, Debtor had left Columbia Grain and was working for Meyer's Farm.

By the spring of 2016, Debtor owed large debts to several agricultural suppliers, including J.R. Simplot, Wilbur Ellis Company and Bob's Ag Service, Inc.  Specifically, he owed the following sums to the suppliers for inputs for the 2015 and 2016 growing seasons:

- J.R. Simplot—$334,253.96;

- Wilbur Ellis Company—$90,636.86;

- Bob's Ag Service—$34,425.

Debtor received bills every month requesting payment from these suppliers.  He had been in contact with J.R. Simplot multiple times regarding his debt to the company. Debtor did not have the financial resources to pay these bills in the spring of 2016.

In May 2016, Debtor learned that AgCountry Farm Credit Services, his secured agricultural lender, would no longer provide financing for his farming operation.  As a result, Debtor began planning for an auction at the end of the 2016 season.  Debtor planned to sell real estate to pay AgCountry and farm machinery and equipment to pay his other creditors.

Around the same time, Debtor began consulting Attorney Scott Stewart about his financial situation.[3]  Reportedly, Attorney Stewart advised Debtor to transfer certain property to Debtor's father and daughter.  Consistent with this advice, Debtor transferred title to his 40-acre homestead (the "Homestead Property") to his father, Arthur Gapp, in May or June 2016.[4]  Debtor and his wife, Roxanne Gapp, continued to reside on the

---

[3] Attorney Stewart did not represent Debtor in his bankruptcy case.

[4] The legal description of the Homestead Property is:  NW1/4 NE1/4 Section 15, Township 163 North Range 57 West of the Fifth Principal Meridian, Cavalier County, N.D. Ex. T-2, T-0052.

3

Homestead Property.  In June 2016, Debtor also transferred a home in Pinal County, Arizona (the "Arizona Property"), to his daughter and son-in-law, Courtney and Dustin Krump.  Neither Debtor's father nor the Krumps provided consideration for the transfers. Ex. T-2 at T-0051.

Debtor explained that he and his wife were no longer using the Arizona Property when they decided to transfer it to the Krumps.  After Debtor transferred the property to the Krumps, he continued to pay the property taxes and "upkeep" expenses on the Arizona Property because he expected that he and his wife would later "get the property back in [their] names."

Debtor repeatedly testified that he did not understand why he transferred the property at the time.  He simply maintained that he transferred the property on the advice of Attorney Stewart.  In fact, Debtor characterized the decision to transfer property to his father and the Krumps as Attorney Stewart's decision.  Debtor admitted that he had received "large bills" from creditors that were unpaid at the time he transferred the property, but he denied seeking attorney advice to protect or hide assets, explore bankruptcy or avoid creditors.  Debtor testified he "talked to [Attorney Stewart] all the time," but he did not understand why his attorney suggested he transfer the property. Debtor also claimed Attorney Stewart did not discuss the potential negative repercussions of the property transfers.  While Debtor admitted to having some financial troubles, he insisted he was not insolvent at the time of the transfers to Arthur Gapp and the Krumps.

In June 2016, Debtor also began selling other assets to keep the farm operating. He sold a 2011 Camaro to his daughter and a 2004 Cadillac Escalade to a neighbor.  Ex. T-05 at T-00112.

4

Debtor worked with AgCountry throughout the spring and summer of 2016 to develop a financial plan. He testified that the farm "cash flowed" well into the spring of 2016. Debtor's net worth, which he claimed totaled $1.1 million in May 2016, included land valued at $2,482,600 and his personal residence valued at $447,000. Ex. T-19. Debtor believed that, with land, machinery and equipment sales and his planted crops, "the numbers looked good." At this point, Debtor was hopeful that he would be able to pay his entire debt to AgCountry and his agricultural suppliers.

Everything changed in July 2016 when a hail storm "wiped out" Debtor's net worth. The storm devastated 3,000 acres of Debtor's crop. Debtor estimated he lost $927,000 as a result of the storm. The storm jeopardized Debtor's plan to pay creditors with crop, land, machinery and equipment sale proceeds.

Debtor borrowed $100,000 from Arthur Gapp in August 2016. Debtor granted Arthur Gapp a mortgage on 40 acres of his property in Cavalier County, North Dakota, as security for this debt. Ex. 2, T-0024. Debtor never repaid the loan. Arthur Gapp is listed as a secured creditor on Schedule D of Debtor's bankruptcy filings. Ex. T-2 at T-0024.

In the fall of 2016, Debtor learned that J.R. Simplot initiated a lawsuit to collect the sum Debtor owed it for 2015 and 2016 inputs. The state court entered a judgment in favor of Simplot in the sum of $334,253.96 on or about October 24, 2016. Ex. T-5 at T-108.

On November 9, 2016, Steffes Auctioneers held an auction sale at which Debtor sold substantially all of his farm machinery and equipment. In his SOFA, Debtor disclosed that he received $1,174,658 for this property. Ex. T-2 at T-52. Debtor also sold numerous

parcels of land at the auction sale for $1,829,000 to $2,800,000.[5]  The sales closed in either December 2016 or January 2017.  Debtor used the proceeds from the auction sale to pay his secured debt to AgCountry, but the sale did not garner sufficient proceeds to pay Debtor's other creditors.  Ex. T-2 at T-0050.  Debtor received $115,000 in sale proceeds after paying AgCountry in full.  According to Debtor, he forwarded this money to Attorney Stewart, who deposited it in his trust account.

Also in December 2016, Debtor hired new counsel to assist him with financial matters.  At the direction of new counsel, Debtor arranged for the transfer of both his Homestead Property and the Arizona Property back to him to "reverse the poor decision" suggested by Attorney Stewart.[6]

### B.    Debtor's Transfer of the Arizona Property

In April 2017 (approximately 10 months after Debtor transferred the Arizona Property to the Krumps), the Krumps transferred the Arizona Property back to Debtor and Roxanne.  Ex. T-2 at T-0051.  Debtor and Roxanne sold the Arizona Property to Jeffrey and Renae Carpenter on April 12, 2017.  Ex. T-2 at T-0051.  Renae Carpenter is Roxanne's sister and Debtor's sister-in-law.  The Carpenters paid Debtor and Roxanne $180,225.46 for the Arizona Property, which had been recently appraised at $160,000.

---

[5] Debtor testified that he received about $2.8 million from land sales in 2017.  On his Statement of Financial Affairs, Debtor disclosed that proceeds from the sale of real estate totaled $1,829,000.  Ex. T-2 at T-0051–52.

[6] In Schedule B, Debtor included a "potential claim against former attorney."  Ex. T-2 at T-0020.  Debtor listed the value of the potential claim as "unknown."  Ex. T-2 at T-0020.  Debtor explained that this claim related to legal advice he received regarding the transfer of Homestead Property and the Arizona Property.

Ex. T-2 at T-0051.  At the advice of new counsel, all of the sale proceeds were deposited

into a bank account held solely in Roxanne's name.  Roxanne arranged for a cashier's

check in the sum of $116,511.66 to be issued to the Internal Revenue Service for Debtor's

and Roxanne's joint 2016 tax liability; a cashier's check in the sum of $29,248 to be issued

to the North Dakota Office of State Tax Commissioner for Debtor's and Roxanne's joint

2016 North Dakota income tax liability; and a payment to the Gapps' recently-hired

counsel in the sum of $5,000.[7]  Ex. T-2 at T-0052; Ex. D-4 at D-190.  The balance of sale

proceeds—$29,465.80—remained in Roxanne's account.

In his SOFA, Debtor represented that proceeds of the sale, $180,225.46, were

"paid to tax liability for 2016."  Ex. T-2 at T-0052.  At trial, Debtor testified that this

representation referred to his share of the proceeds only, not the entire sum.[8]

Debtor and Roxanne owned the Arizona Property jointly when they sold it.  Both

considered half of the proceeds from the sale to be Debtor's and half to be Roxanne's.

Debtor testified that he used his half of the proceeds—approximately $90,000—to pay

Debtor's and Roxanne's joint tax liability.[9]  Roxanne used a portion of her half of the

proceeds, roughly $60,000, to pay the couple's joint tax liability.  Roxanne believed she

could use her share of the proceeds as she wished because it was her money, and she

felt compelled to pay a portion of their joint tax liability because "it was [her] debt too."

---

[7] Debtor testified that he did not have access to Roxanne's account; consequently, Roxanne made arrangements to pay the IRS, the North Dakota Office of State Tax Commissioner and their attorneys.

[8] Debtor's testimony was inconsistent regarding whether the representation on his SOFA referred to "all proceeds" or "his proceeds."

[9] Debtor acknowledged that Roxanne was jointly liable for their total tax debt of $145,759.66 because she was a joint owner of the farm and the couple filed taxes jointly.

7

Roxanne kept the remaining portion of the sale proceeds, $29,465.80. Debtor testified that this sum was her money, and he did not believe any of the $29,465.80 in Roxanne's account belonged to him. Roxanne does not believe that Debtor has a claim against her share of the sale proceeds. Debtor does not have access to the money in Roxanne's account.

### C.    Debtor's Statements on His Bankruptcy Schedules and SOFA

Debtor petitioned for bankruptcy relief under Chapter 7 of the Bankruptcy Code on August 29, 2017. Ex. T-01. Debtor filed individually.

Debtor filed the required bankruptcy schedules and SOFA on September 12, 2017. Ex. T-02.[10] On his SOFA, he listed numerous property transfers within the two years prior to bankruptcy, including the transfer of several parcels of real estate, farm machinery and equipment, vehicles and recreational items. Ex. T-2 at T-0051–53. In all, Debtor transferred approximately $3,200,000 of property during the two-year period. Ex. T-2, T-0051–53.

Debtor filed amended schedules on September 20, 2017 (Ex. T-03) and February 7, 2018 (Ex. T-5). Debtor signed his original and amended schedules and SOFAs, acknowledging that these documents were "true and correct." Ex. T-02, T-0046, T-0055. Despite acknowledging his duty to disclose, Debtor omitted assets and transfers from his

---

[10] On Schedule A/B, Debtor indicated he owned several parcels of real estate in joint tenancy. Ex. T-2 at T-0013–14. To complete the bankruptcy form, Debtor provided the full value of the property as well as the value of the portion he owned, which was half. Ex. T-2 at T-0013–14. For example, Debtor indicated the total value of a parcel of land in Fremont Township in Cavalier County was $19,600 and valued his interest at $9,800. Ex. T-2 at T-0013. Debtor completed Part 1 (real estate) and Part 2 (vehicles) of Schedule A/B in this manner. Where he was the sole owner, he indicated the value of his share was the total value of the property. Where another person held an interest in the property, Debtor listed his value as a portion of the total value. See Ex. T-2 at T-0013–16.

schedules and SOFA.  In addition, the Trustee alleges Debtor undervalued a Harley Davidson motorcycle and a Bobcat Skid Steer Loader.

### 1.   Debtor's Omissions

FSA Payments.  Debtor failed to disclose potential payments from the USDA Farm Service Agency (FSA) on his original bankruptcy schedules. Debtor testified that when he was running his own farm, he met with FSA representatives at least once per year, usually during the spring enrollment period.  Debtor enrolled in FSA's Agriculture Risk Coverage (ARC) and Price Loss Coverage (PLC) programs in the spring of 2016.  He was familiar with these programs because he had enrolled in the programs in 2014 and 2015.

According to Debtor, FSA determines the payments that will be made to program participants in the ARC and PLC programs in the fall of the year following enrollment based on September commodity futures.  Debtor testified that program participants learn in November of each year whether they would receive payments under the programs enacted the year before.  By way of example, FSA payments to farmers under the 2016 ARC and PLC programs were based on September 2017 commodity futures, and FSA informed program participants in November 2017 whether they would receive payments under the 2016 programs.  Debtor testified that the payment scheme is "too complicated" for individual farmers to estimate what payments they will receive or to speculate whether they will receive payments under the programs.

Based on his understanding of the programs, Debtor maintained he did not know whether he would receive any 2016 FSA program payments when he filed his bankruptcy petition on September 12, 2017.  He did not call an FSA employee to inquire about his

potential program payments because he believed that doing so was futile. Instead, Debtor learned in November 2017 that he was entitled to program payments for 2016 when he received a report from FSA. Ex. D-110, D-200. Debtor testified that FSA knew about his bankruptcy. He also understood that FSA would send all of his postpetition farm program payments directly to the Trustee. Consistent with this understanding, FSA sent the Trustee a statement dated December 19, 2017, listing the disbursements Debtor was entitled to receive under the farm programs. Ex. T-22. FSA disbursed the funds directly to the Trustee. Debtor testified he never intended to "pocket" the disbursements because he knew FSA would send them directly to the Trustee.

Debtor filed amended bankruptcy schedules on February 9, 2018. Ex. T-5 at 105. Debtor included the $70,249.80 he received under the ARC and PLC programs on his amended schedules. He also included a $358 CRP program payment he received. Ex. T-5, 105. Debtor testified he overlooked the CRP payment when completing his original schedules.

Fishing Equipment. Debtor failed to list fishing equipment on his original Schedule B under the entry for "equipment for sports and hobbies." He claimed his fishing equipment consisted of four or five rods Debtor purchased from Walmart, which he described as "cheap." Debtor admitted he "completely forgot" about the fishing equipment because he had not fished the past several years. When the Trustee asked Debtor about his boat at the meeting of creditors in October 2017, Debtor remembered the fishing equipment and admitted to owning it. He subsequently amended his schedules to disclose the fishing equipment, which he valued at $115. Ex. T-5 at T-101.

10

Hummer/Ford Equinox.  In the fall of 2011, Debtor purchased a 2006 Hummer H-3.  The Hummer was titled solely in Debtor's name.  Debtor gave the Hummer to his daughter, Cristen, in the spring of 2012 as a high school graduation gift.  Only Cristen drove the Hummer, but Debtor did not transfer the title to her for insurance reasons.  Debtor testified he was concerned that, if he transferred the title to Cristen, the price of auto insurance would double because Cristen was under 18 years old.

In June 2016, Debtor sold the Hummer, but he did not keep any of the sale proceeds.  He claims he gave the sale proceeds to Cristen, and she used the proceeds to purchase a 2006 Ford Equinox.  The bill of sale from Elite Motors in Fargo shows the dealership received $6,999 cash in exchange for the Equinox.  Ex. T-21.  Although the title for the Equinox includes both Debtor's and Cristen's names and Debtor and Cristen described Debtor as the co-owner, Debtor maintains that he gave the Equinox to Cristen as a replacement for the Hummer.  Debtor paid many of the insurance, maintenance and repair expenses related to the Hummer, including a $570 maintenance bill in 2016.

Debtor failed to disclose his ownership interest in the Equinox in his original schedules.  He also failed to disclose the 2016 sale of the Hummer H3 that Cristen drove until Debtor replaced it with the Equinox.  Debtor added the sale of the Hummer and the purchase of the Equinox to his amended SOFA, but he did not amend Schedule B to list his ownership interest in the Equinox.  Ex. T-5, T-00112.

Camaro.  Debtor owned a 2011 Chevrolet Camaro SS, which he kept at his residence in Arizona until June 2016.  Debtor approached his daughter, Chantel, about potentially purchasing his Camaro sometime before June 2016.  According to Chantel, Debtor told her "in a roundabout way" that he was experiencing financial distress and

needed cash quickly.  Chantel agreed to buy the Camaro and paid Debtor the amount he suggested, $9,000 cash.  Chantel thought $9,000 was the fair market value of the Camaro.  Debtor also believes he sold the Camaro to Chantel for fair market value.

Debtor did not disclose the June 2016 transfer of the Camaro to Chantel.  Debtor explained that he forgot to include it on his original schedules because he kept the vehicle in Arizona and Debtor "had so much going on" that he was not thinking about the Camaro. At the meeting of creditors, the Trustee asked Debtor whether he had any vehicles in Arizona.  Debtor told the Trustee that the Camaro had been in Arizona and disclosed the sale of the Camaro.  Debtor claims he did not attempt to conceal the sale of the Camaro from the Trustee.  Debtor included the sale of the Camaro in his amended SOFA filed on February 9, 2018.  Ex. T-5.

Cadillac Escalade.  Debtor did not initially disclose the June 2016 sale of his 2004 Cadillac Escalade to Floyd Clark for $7,000.  Compl. ¶10.  As with the Camaro, Debtor testified that he overlooked the sale of the Cadillac because he kept it at his Arizona residence.  When the Trustee asked him whether he had any vehicles in Arizona, Debtor told the Trustee about the sale of the Cadillac.  Debtor considered $7,000 to be fair market value for the vehicle.  Debtor included the sale of the Cadillac in his amended SOFA filed on February 9, 2018.  Ex. T-5 at T-00112.

Snowmobile.  In 2013, Debtor purchased two Arctic Cat snowmobiles from Hamm's Repair in Warren, Minnesota.  Ex. T-20 at T-00262.  Debtor purchased the snowmobiles with funds he borrowed from North Star Community Credit Union.  Debtor was the sole obligor on the promissory note, and he made all the payments to North Star Community Credit Union.  Debtor gave one of the snowmobiles to his son, Colton, as

compensation for Colton's work on the farm. Colton's snowmobile was titled in Colton's name.

In November 2016, Debtor paid $5,696.49 to North Star Community Credit Union. The payment satisfied a loan obligation purportedly secured by Colton's snowmobile. Ex. T-20. Debtor knew that when he made the final payment in November 2016, the debt would be paid in full, but he did not disclose this payment on his original schedules or on his amended SOFA. See Doc. 1 ¶ 12; Ex. T-5 at T-00108.

## 2.   Debtor's Allegedly Low Value Estimates

2015 Harley.   The Trustee asserts that Debtor undervalued a 2015 Harley Davidson Triglide Ultra Classic Motorcycle. Doc. 1 ¶ 6. Debtor listed the motorcycle in Schedule B and indicated he owns a one-half interest in it. Ex. 2 at T-0015. He valued the motorcycle at $22,472 and his interest in the motorcycle at $11,236. Ex. 2 at T-0015.

Debtor purchased the motorcycle (which was new) in August 2015 for $30,000. Debtor arrived at the value he included in his bankruptcy schedules by referring to Autotrader, an online marketplace that includes estimated values of used vehicles. He thought approximately $22,000 was a reasonable value based on the age of the motorcycle and its mileage. He did not take his motorcycle to a dealer to request a value estimate. Debtor asserts he did not intend to deceive the Trustee by undervaluing the Harley Davidson.

Although Debtor maintains that $22,000 is a reasonable value, Debtor entered into a reaffirmation agreement with the secured creditor, Harley Davidson Credit, which listed the current market value of the motorcycle at $29,675. Ex. T-4. Debtor testified that the creditor supplied the current market value for the reaffirmation agreement. Debtor

thought the value was high, but he did not dispute the amount. Harley Davidson Credit was not willing to "negotiate" the value on the reaffirmation agreement, and Debtor wanted to reaffirm the debt, so he signed the agreement despite the reported value of the motorcycle.

Bobcat Skid Steer Loader. The Trustee asserts that Debtor also undervalued a 2013 Bobcat Skid Steer Loader. Doc. 1 ¶ 4. On Schedule B, Debtor indicated he is the sole owner of the Bobcat, which he valued at $10,000. Ex. T-2, T-0015. However, Debtor listed the current value of the portion he owns as $5,000,[11] suggesting that he is a joint owner of the Bobcat. Ex. T-2 at T-0015. He purchased the Bobcat in 2013 for $48,000.

To arrive at the $10,000 value, Debtor reviewed results published by Steffes Auction for Bobcats of similar age and condition. Debtor's Bobcat had been used approximately 352 hours at the time, and it was in good condition. Debtor testified that the Steffes Auction data included a sale of the same model Bobcat with similar usage hours for $10,000.

On January 31, 2018, the Trustee and Debtor entered into a Sale Agreement that allowed Debtor to buy the bankruptcy estate's interest in certain non-exempt property, including the Bobcat.[12] Ex. T-8. The agreement provided that Debtor would pay $18,000

---

[11] Wells Fargo Financial Services held a purchase money security interest in the Bobcat at the time. Ex. T-2, T-0025. Debtor owed this creditor $4,400 at the time. Debtor denied that the remaining debt he owed Wells Fargo Financial Services played any role in his valuation of the Bobcat. Debtor did not declare an exemption in the Bobcat.

[12] The Trustee offered the Sale Agreement as evidence at trial. Debtor objected to the admission of the sales agreement into evidence. Relying on Federal Rule of Evidence 408, Debtor argued that the Sale Agreement was inadmissible to prove the value of the Bobcat or to impeach Debtor's valuation of the Bobcat in his schedules. Doc. 28. Rule 408 provides:

for his half interest, implicitly valuing the Bobcat at $36,000.  Ex. T-8.  Debtor testified that

he cooperated with the Trustee by providing pictures of the Bobcat, which allowed the

---

> (a) Prohibited Uses.  Evidence of the following is not admissible—on behalf
> of any party—either to prove or disprove the validity or amount of a disputed
> claim or to impeach by a prior inconsistent statement or contradiction:
>> (1) furnishing, promising, or offering—or accepting, promising to
>> accept, or offering to accept—a valuable consideration in compromising or
>> attempting to compromise the claim; and
>> (2) conduct or a statement made during compromise negotiations
>> about the claim[.]
> (b) Exceptions.  The court may admit this evidence for another purpose,
> such as providing a witness's bias or prejudice, negating a contention of
> undue delay, or proving an effort to obstruct a criminal investigation or
> prosecution.

Fed. R. Evid. 408.  The Eighth Circuit views the scope of Rule 408 narrowly.  Poulos v.
Summit Hotel Props., LLC, 2010 WL 2034634, at *3 (D.S.D. May 21, 2010) (citing
Dahlgren v. First Nat'l Bank, 533 F.3d 681, 699 (8th Cir. 2008)).  The rule is concerned
with excluding proof of compromise to show liability of the offeror.  Atmosphere Hospitality
Mgmt., LLC v. Shiba Inv., Inc., 158 F. Supp. 3d 837, 844 (D.S.D. 2016) (citing Crues v.
KFC Corp., 768 F.2d 230, 233 (8th Cir. 1985)).  Accordingly, to be inadmissible under
Rule 408, the evidence must relate to a claim that was in dispute as to validity or amount
at the time the settlement negotiations or offer of compromise took place.  Weems v.
Tyson Foods, Inc., 665 F.3d 958, 965 (8th Cir. 2011).

Debtor characterizes the Sale Agreement as a "settlement" or "compromise" with
the Trustee.  Although Debtor and the Trustee negotiated the sum Debtor paid to
purchase the bankruptcy estate's interest in the Bobcat and other assets, this negotiation
did not result in the compromise of a disputed claim.  Rule 408 does not bar evidence of
compromise of any and all disputes—it only bars evidence of compromise of disputed
claims.  See Fed. R. Evid. 408 ("Evidence of the following is not admissible . . . to prove
or disprove the validity or amount of a disputed claim[.]").  "A dispute exists for Rule 408
purposes [when] there is 'an actual dispute or difference of opinion' regarding a party's
liability for or the amount of the claim."  Weems, 665 F.3d at 965 (internal citations
omitted).  The parties did not negotiate the resolution of a claim or cause of action the
Trustee brought against Debtor; they negotiated an asset sale.  Debtor was free to accept,
reject or negotiate, with no liability attaching if the parties failed to reach an agreement.
The fact that the parties disagreed about the value of the Bobcat the bankruptcy estate
sold to Debtor does not mean that their agreement on a sale price equates to a resolution
of a disputed claim under Rule 408.  Rule 408 does not bar admission of the Sale
Agreement.  Debtor's objection is overruled.

Trustee to research its value.   Debtor testified that he disputed the Trustee's valuation but ultimately agreed to it.

### D.   Allegations Not in the Complaint

At trial, the Trustee raised additional omissions and transfers that he did not plead in the Complaint.[13]   Specifically, the Trustee points to Debtor's failure to disclose $38,664.02 of CHS Patronage Credits in his original bankruptcy filings.  Ex. T-5, T-00105. Debtor testified that he receives a statement of his patronage credits annually in March. Debtor has never received a patronage credit disbursement because the credits are not accessible until Debtor is 70 years old.  He claims he simply did not think to list the credits as property on his original schedules because this asset is not accessible to him.  When Debtor amended his schedules in February 2018, he added the patronage credits to Schedule B.

The Trustee also highlighted Debtor's failure to list a $329.47 wage garnishment on his original schedules.  Debtor disclosed the garnishment on his amended Schedule B.

Finally, the Trustee argues that Debtor failed to disclose the source of several deposits into a checking account at Choice Financial from May to August 2017.

---

[13]  Debtor objected to the Court receiving this evidence, asserting that the allegations were beyond the scope of the Complaint.  The Trustee argued the evidence was recently discovered, and it was difficult to know at the time he filed the Complaint whether he had uncovered all Debtor's nondisclosures.  The Court overruled Debtor's objections, holding that the omissions or nondisclosures are relevant to Debtor's credibility.  The Court also advised the parties that, in deciding whether these alleged omissions would be considered in its analysis of section 727, it would carefully consider whether the additional allegations fell within the scope of the Trustee's Complaint.  The Court finds that the evidence falls within the scope of the Trustee's Complaint and the Court considered this evidence in its analysis of the Trustee's claims.

Specifically, the Trustee pointed to deposits of $14,500 on August 8, 2017; $2,000 on June 9, 2017; $800 on May 2, 2017; and $1,200 on May 11, 2017.  Ex. T-11.  Debtor recalled that the $14,500 deposit resulted from the sale of assets, and he testified that he paid the IRS with this money.[14]  He could not recall the source of the other deposits or whether they represented proceeds from the sale of his assets.  Debtor denied that he had cash of that quantity "sitting around" his house.

## III.    CONCLUSIONS OF LAW

### A.    Jurisdiction

This adversary action is a core proceeding under 28 U.S.C. § 157(b)(2)(J).  The Court has jurisdiction under 28 U.S.C. §§ 1334 and 157 and authority to enter a final order in this matter.  This opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

### B.    Denial of Discharge Standards

In the Complaint, the Trustee seeks a denial of Debtor's discharge under 11 U.S.C. § 727(a)(2) and (a)(4).  Section 727 of the Bankruptcy Code provides:

(a)    The court shall grant the debtor a discharge, unless . . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under [the Bankruptcy Code], has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A)    property of the debtor, within one year before the date of the filing of the petition; or

---

[14] During discovery, Debtor informed the Trustee that the $14,500 deposit represented proceeds from the sale of a 2001 Lund Fisherman Boat and a 2011 United Snowmobile Trailer.  See Ex. D-111.  He also disclosed that he made a $14,500 payment to the IRS.

(B)    property of the estate, after the date of the filing of the
petition;

\* \* \*

(4) the debtor knowingly and fraudulently, in or in connection with the
case—

(A) made a false oath or account[.]

11 U.S.C. § 727(a).

Denying the debtor a discharge is a harsh remedy.  Home Serv. Oil Co. v. Cecil

(In re Cecil), 542 B.R. 447, 451 (B.A.P. 8th Cir. 2015).  Accordingly, courts strictly

construe section 727 in favor of the debtor.  Id.  While this standard favors debtors, it is

also true that a discharge in bankruptcy and the associated fresh start are privileges, not

rights.  Bauer v. Iannacone (In re Bauer), 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003) (citing

Grogan v. Garner, 498 U.S. 279, 286 (1991)).  "The opportunity for a completely

unencumbered new beginning is limited to the honest but unfortunate debtor."  Id.  The

cost to the debtor for an unencumbered fresh start is minimal, but it includes honestly and

accurately disclosing his or her financial affairs and cooperating with the trustee.  Id.; see

also 11 U.S.C. § 521 (listing a debtor's duties in bankruptcy).  "To prevail in an action to

deny a debtor's discharge, the objecting party must prove each element under § 727 by

a preponderance of the evidence."  Kaler v. Charles (In re Charles), 474 B.R. 680, 683–

84 (B.A.P. 8th Cir. 2011) (citing Allred v. Vilhauer (In re Vilhauer), 458 B.R. 511, 514

(B.A.P. 8th Cir. 2011)).

## 1.    Denial of Discharge Under 11 U.S.C. § 727(a)(2)

To prevail under section 727(a)(2)(A), the Trustee must prove by a preponderance

of the evidence: (1) Debtor's actions took place within one year before the petition date;

(2) the act was that of Debtor; (3) the act amounted to a transfer, removal, destruction,

18

mutilation or concealment of property; and (4) the act was done with an intent to hinder, delay or defraud a creditor or the Trustee.  See Georgen-Running v. Grimlie (In re Grimlie), 439 B.R. 710, 716 n.11 (B.A.P. 8th Cir. 2010); Kaler v. Huynh (In re Huynh), 392 B.R. 802, 810 (Bankr. D.N.D. 2008).  "Once a gratuitous transfer is shown, the burden then shifts to the debtor to prove his intent was not to hinder, delay, or defraud his creditors."  Cadlerock Joint Venture II, L.P. v. Sandiford (In re Sandiford), 394 B.R. 487, 490 (B.A.P. 8th Cir. 2008).

The Trustee argues that "the transfer at issue here is the Debtor's transfer of his one-half interest in the sales proceeds from the sale of the Arizona residence to his non-filing spouse."  Doc. 27 at 4.  Debtor admits that "100% of the proceeds from the sale were deposited into the separate bank account of the [Debtor's] spouse," but denies that this constitutes a transfer of his property actionable under section 727(a)(2)(A).  Doc. 28 at 3–4.

Debtor and Roxanne sold the Arizona Property they jointly owned on April 12, 2017, and they deposited the full $180,225.46 in proceeds into Roxanne's account.  Ex. T-2, T-0051.  Debtor admitted to depositing his share of the proceeds into Roxanne's account.  Roxanne testified that Debtor did not have access to this account or authority to withdraw money from it.  This evidence shows that the transfer of Debtor's interest in the Arizona Property sale proceeds to his wife's account was an act of Debtor that qualifies as a transfer under section 727(a)(2).[15]  To the extent that Debtor retained

---

[15] See Rose v. Reaves (In re Rose), 574 B.R. 141, 150–51 (D. Ariz. 2017) (finding that the debtor's transfer of funds to an account in the name of a non-debtor third party beyond the reach of the debtor's creditors was a disposition by transfer under section 727(a)(2)(A) and that the debtor's payment of attorneys, accountants and other creditors from this account was a second transfer under section 727(a)(2)(A)); Georgen-Running

control or influence over how Roxanne spent the money in her account, the transfer of "Debtor's share" of the funds to the IRS constitutes a second transfer.  See Rose v. Reaves (In re Rose), 574 B.R. 141, 150–51 (D. Ariz. 2017).  Since Debtor filed his bankruptcy petition on August 29, 2017, this transfer occurred within one year of the petition date.  Accordingly, the Trustee met his burden of proving the first three elements of section 727(a)(2)(A).  See In re Grimlie, 439 B.R. at 716 n.11.

The next issue and final element under section 727(a)(2)(A) is whether Debtor made the transfer with the intent to hinder, delay or defraud a creditor or the Trustee.  Id. Because a debtor rarely admits to fraudulent intent, a party seeking denial of discharge must generally rely on a combination of circumstances, or "badges of fraud," that suggest the debtor harbored the necessary intent.  In re Huynh, 392 B.R. at 810.  The "badges of fraud" include:  (1) lack or inadequacy of consideration; (2) family, friendship or other close relationship between the transferor and transferee; (3) retention of possession, benefit or use of the property in question; (4) financial condition of the transferor prior to and after the transaction; (5) conveyance of all of the debtor's property; (6) secrecy of the conveyance; (7) existence of trust or trust relationship; (8) existence or cumulative effect of pattern or series of transactions or course of conduct after the pendency or threat of

---

v. Grimlie (In re Grimlie), 439 B.R. 710, 716–17 (B.A.P. 8th Cir. 2010) (affirming bankruptcy court's denial of discharge under section 727(a)(2) where the debtor, days after being served with a $270,000 judgment, opened a new bank account in his wife's name and thereafter deposited all his income into the account); Freelife Int'l, LLC v. Butler (In re Butler), 377 B.R. 895, 917–18 (Bankr. D. Utah 2006) (defining transfer under section 727(a)(2) as "any disposition of an interest in property which includes a transfer of possession, custody, or control even if there is no transfer of title and which also includes deposits to, withdrawals from, and transfers between bank accounts or similar accounts"); James v. Tipler (In re Tipler), 360 B.R. 333, 341 (Bankr. N.D. Fla. 2005) (finding the debtor's deposit of $120,000 into a joint account with his wife was a transfer under section 727(a)(2)).

suit; (9) instrument affecting the transfer suspiciously states it is bona fide; (10) debtor makes voluntary gift to family member; and (11) general chronology of events and transactions under inquiry.  Id.  The list is non-exhaustive, and courts are free to consider "any other factors bearing upon the issue of fraudulent intent."  Ritchie Capital Mgmt., LLC v. Stoebner, 779 F.3d 857, 863 (8th Cir. 2015) (in the context of a fraudulent transfer action under 11 U.S.C. §548(a)(1)(A))[16] (quoting Jensen v. Dietz (In re Sholdan), 217 F.3d 1006, 1009–10 (8th Cir. 2000)); Dunker v. Bachman (In re Bachman), 2017 WL 3098093, at * 4 (Bankr. D. Neb. July 20, 2017).

The presence of a single badge is typically not sufficient to establish actual fraudulent intent.  Brown v. Third Nat'l Bank (In re Sherman), 67 F.3d 1348, 1354 (8th Cir. 1995).  The confluence of several badges, however, creates a presumption of fraudulent intent.  Ritchie Capital Mgmt., 779 F.3d at 861–62; Kelly v. Armstrong, 141 F.3d 799, 802 (8th Cir. 1998); Dantzler v. Zulpo (In re Zulpo), 592 B.R. 231, 247 (Bankr. E.D. Ark. 2018); see also Rademacher v. Rademacher (In re Rademacher), 549 B.R. 889, 894 (Bankr. E.D. Mo. 2016) (noting that the presence of more than one badge of fraud "strongly indicates that the debtor did, in fact, possess the requisite intent.").

---

[16] Recognizing the nearly identical wording of Code sections 522(o), 548(a)(1)(A) and 727(a)(2), the Eighth Circuit Court of Appeals and numerous bankruptcy courts apply the same standard of "intent to hinder, delay or defraud" a creditor to cases under these sections.  See Addison v. Seaver (In re Addison), 540 F.3d 805, 811–12 (8th Cir. 2008); Jensen v. Dietz (In re Sholdan), 218 B.R. 475, 481 (Bankr. D. Minn.1998), aff'd 217 F.3d 1006 (8th Cir. 2000) (citing cases) ("The Eighth Circuit has approved the use of the same inferential process in applying the statutory language 'with intent to hinder, delay or defraud creditors,' wherever that language is found—in state fraudulent-transfer statutes, 11 U.S.C. § 548(a), or 11 U.S.C. § 727(a)(2)").  This standard includes the badges of fraud analysis.  In re Addison, 540 F.3d at 811–12; Dantzler v. Zulpo (In re Zulpo), 592 B.R. 231, 247 (Bankr. E.D. Ark. 2018) ("Courts have applied the inferential 'badges of fraud' approach to determine whether a debtor acted with fraudulent intent, regardless of which of these provisions is being construed.")

The Trustee offered evidence showing Debtor transferred his share of the Arizona Property proceeds to his wife without consideration.  By doing so, he moved the proceeds beyond the access of Debtor's creditors, including Debtor's agricultural suppliers.[17]  The fact that Roxanne transferred "Debtor's share" of the proceeds to the taxing authorities does not negate Debtor's intent to hinder, delay or defraud creditors.  See In re Rose, 574 B.R. at 153 (finding that withholding funds from one creditor to pay another does not "absolve the debtor" of a § 727(a)(2) violation) (citing In re Schafer, 294 B.R. 126, 131 (N.D. Cal. 2003)).  To the contrary, it shows that Debtor and/or Roxanne used the proceeds to pay a joint creditor, rather than creditors to whom Debtor was solely liable. It also shows that Debtor either retained control over the proceeds or, at a minimum, influenced Roxanne's decisions on how to spend his share of the proceeds.

Additionally, Debtor's transfer of the Arizona Property sale proceeds is one among a series of transfers to family members that occurred within a roughly one-year period from June 2016 until Debtor filed bankruptcy in August 2017.  In June 2016, Debtor sold a Hummer titled in his name that he testified was a gift to his daughter, Cristen.  Debtor

---

[17] At trial, the Trustee inferred that Debtor attempted to conceal or mislead creditors by the way he disclosed the disposition of the Arizona Property sale proceeds. Question 18 on the SOFA instructed Debtor to list all transfers he made within two years prior to filing for bankruptcy, other than in the ordinary course of his business or financial affairs.  Question 18 also instructs the filer to "[d]escribe any property or payments received or debts paid in exchange" for the transfer.  Debtor listed the transfer of the Arizona Property to Jeffrey and Renae Carpenter under question 18.  Ex. T-2, T-0052. Under "payments received," Debtor listed the $180,225.46 in proceeds and represented that "[p]roceeds paid to tax liability for 2016."  Ex. T-2, T-0052.  This representation is misleading because Debtor testified at trial that he was referring only to his share of the proceeds, i.e., approximately $90,000, which is inconsistent with his response to Question 18.  It is also misleading because the sum Debtor and Roxanne paid to taxing authorities totals $145,759.66, not $180,225.46.

gave the proceeds to his daughter, which she used to buy an Equinox titled in both Debtor's and Cristen's name. Debtor claims that Cristen owns the vehicle.

Also in June 2016, Debtor sold a 2011 Chevrolet Camaro SS to his daughter, Chantel, for $9,000 but failed to disclose this transfer in his original schedules. In November 2016, he satisfied a loan obligation secured by snowmobiles, one of which was titled in his son's name.

The other transactions—the transfer of Debtor's homestead to his father and the original transfer of the Arizona Property to the Krumps—were gratuitous and occurred at a time when Debtor was unable to pay his debts to agricultural suppliers J.R. Simplot, Wilbur Ellis Co. and Bob's Agricultural Service. Although J.R. Simplot had not yet filed suit when Debtor transferred property to his father and the Krumps, it had been in contact with Debtor multiple times demanding payment throughout the spring of 2016.

Debtor's financial distress increased significantly by the time he transferred his share of the Arizona Property sale proceeds to Roxanne in April 2017. By then, Debtor was burdened by J.R. Simplot's $334,253.96 October 2016 judgment. He had already sold most of his farm machinery and equipment and numerous parcels of land to pay his debt to AgCountry. By transferring the proceeds directly to Roxanne's account rather than one in his name, Debtor avoided a judgment creditor attaching the proceeds to satisfy its judgment. At the same time, he and Roxanne enjoyed the benefit of paying joint tax obligations.

Accordingly, the Trustee offered evidence showing several badges of fraud, including lack or inadequacy of consideration; family relationship between the transferor and transferee; retention of benefit or use of the property in question; financial condition

23

of the transferor prior to and after the transaction; existence or cumulative effect of pattern or series of transactions or course of conduct after the pendency or threat of a lawsuit; voluntary gift to family member; and general chronology of events and transactions under inquiry.  See In re Huynh, 392 B.R. at 810.  Based on all these factors and badges of fraud, the Court finds the Trustee offered evidence sufficient to create a presumption of fraudulent intent.  See Ritchie Capital Mgmt., 779 F.3d at 861–62; In re Zulpo, 592 B.R. at 247; supra note 16.

To rebut the Trustee's argument and evidence, Debtor claims that half of the Arizona Property sale proceeds are his property, and he used his share to pay debts he owed.  Doc. 28 at 3–4.  He argues that the balance of proceeds remaining in Roxanne's account after this payment is Roxanne's separate property.  From this evidence, he maintains that the facts "do not represent a transfer of Defendant's property actionable under section 727(a)(2)."  Doc. 28 at 4.  More specifically, Debtor argues that "[t]he sole transfer upon which the Trustee relies for his claim under 11 U.S.C. § 727(a)(2) never occurred.  The property at issue was always owned solely by the Debtor's spouse."  Doc. 23.

The Court is not persuaded.  The transfer that serves as the source of Debtor's section 727(a)(2) violation is the deposit of his share of the Arizona Property sale proceeds into his wife's bank account, making it inaccessible to Debtor's creditors.  To the extent Debtor exercised sufficient control over Roxanne's account to pay his $90,000 share of the proceeds to taxing authorities, this payment is a second transfer actionable under section 727(a)(2).  Debtor's argument that the Trustee has not established an actionable transfer under section 727(a)(2) is rejected.

24

At trial, Debtor and Roxanne testified that they deposited all the proceeds from the sale of the Arizona Property in Roxanne's account on the advice of counsel.  See also Doc. 28 at 3.  Where a debtor's actions are motivated by attorney advice, reliance on this advice may rebut a presumption of fraudulent intent if the reliance was reasonable and the attorney was fully informed before giving it.[18]  City Nat'l Bank v. Bateman (In re Bateman), 646 F.2d 1220, 1224 (8th Cir. 1981); Kaler v. Geller (In re Geller), 314 B.R. 800, 808 (Bankr. D.N.D. 2004); Kaler v. McLaren (In re McLaren), 236 B.R. 882, 897

---

[18]  The Eighth Circuit Bankruptcy Appellate Panel (BAP) in Floret, L.L.C. v. Sendecky (In re Sendecky) suggested a slightly different standard.  283 B.R. 760, 765 (B.A.P. 8th Cir. 2002).  In upholding the bankruptcy court's findings, the BAP incorrectly cited In re McLaren and In re Craig for the proposition that reliance on an attorney's advice may excuse acts that otherwise bear the indicia of fraud if the attorney was informed of all relevant facts and "the advice is reasonable."  In re Sendecky, 283 B.R. at 765 n.19, 20, 21 (citing Kaler v. McLaren (In re McLaren), 236 B.R. 882 (Bankr. D.N.D. 1999); Kaler v. Craig (In re Craig), 195 B.R. 443, 452 (Bankr. D.N.D. 1996)).  The BAP considered this standard and upheld the bankruptcy court, in part, because the bankruptcy court found that there was no evidence in the record that Mr. Sendecky's counsel offered unreasonable advice.  Id. at 765.  Since its publication, several bankruptcy courts have cited In re Sendecky for the proposition that reliance on an attorney's advice will excuse acts bearing the indicia of fraud if the attorney's advice was reasonable.  See e.g., Dains v. Dains (In re Dains), 384 B.R. 241, 253 (Bankr. W.D. Mo. 2008); Seaver v. Markey (In re Markey), 378 B.R. 594, 603–04 (Bankr. D. Minn. 2007).

The bankruptcy court in In re McLaren, summarized the defense as follows:

> Where a debtor's actions were motivated by attorney advice, that reliance, if reasonable, may excuse acts which otherwise bear indicia of fraud. However, the attorney must have been made fully aware of all relevant facts—that is, the debtor must have made a full and fair disclosure to him. Reliance on attorney advice absolves one of intent only where that reliance was reasonable and where the advice given was informed advice.

In re McLaren, 236 B.R. at 897 (emphasis added).  Similarly, the bankruptcy court in In re Craig noted: "Mistaken reliance upon an attorney's advice will excuse acts of fraudulent intent only if reliance was reasonable and the attorney was aware of all relevant facts." In re Craig, 195 B.R. at 452 (citing In re Bateman, 646 F.2d 1220, 1224 (8th Cir.1981); McDonough v. Erdman (In re Erdman), 96 B.R. 978, 985 (Bankr. D.N.D. 1988)) (emphasis added).  The Court adopts the standards articulated in In re McLaren and In re Craig.

(Bankr. D.N.D. 1999); Kaler v. Craig (In re Craig), 195 B.R. 443, 452 (Bankr. D.N.D. 1996); see also Layng v. Rael (In re Rael), 753 Fed.App'x 649, 656 (10th Cir. 2018); Robinson v. Worley, 849 F.3d 577, 586 (4th Cir. 2017); Buckeye Ret. Co., LLC, Ltd. v. Swegan (In re Swegan), 383 B.R. 646, 656 (B.A.P. 6th Cir. 2008).   Debtor carries the burden of showing "a full disclosure of all relevant facts to the attorney and a reasonable belief that he was receiving reliable advice." Sergeant v. G.R.D. Inv. L.L.C (In re Schaefer), 331 B.R. 401, 423 (Bankr. N.D. Iowa 2005) (citation omitted).

Debtor did not offer evidence supporting either of these elements.  Neither Debtor nor Roxanne testified about what information they provided their attorney or why their attorney suggested they handle the transaction in the manner they outlined.  Debtor did not call his attorney to testify as a witness at trial.[19]  Debtor did not list reliance on the advice of counsel as a defense in Debtor's Answer and did not assert it as a defense in his pretrial or posttrial briefs.[20]  Debtor offered advice of counsel as a fact, testifying that Debtor and Roxanne deposited the proceeds from the sale of the Arizona Property in Roxanne's bank account "on the advice of counsel," but he offered no information about the context or circumstances regarding this advice.  Because the Court cannot conclude

---

[19] It is difficult to prove good faith reliance on advice of counsel without calling the attorney as a witness.  See Arvest Bank v. Dokes (In re Dokes), 2017 WL 1743498, at *23 n.29 (Bankr. E.D. Ark. May 2, 2017); In re Bauer, 291 B.R. 127, 130 (Bankr. D. Minn. 2003), aff'd, 298 B.R. 353 (B.A.P. 8th Cir. 2003).

[20] As a defense to the Trustee's section 727(a)(2) cause of action, Debtor asserts in his pretrial brief that Debtor did not transfer property to his spouse, claiming the proceeds from the sale of the Arizona Property "was always owned solely by the Debtor's spouse."  Doc. 23 at 1.  In his posttrial brief, he also asserts that the "funds at issue were the sole property of the Defendant's spouse," and he claims that the transfer of the proceeds of the Arizona Property to Roxanne's bank account or her retention of her share of the proceeds "do not represent a transfer of the Defendant's property actionable under 11 U.S.C. § 727(a)(2)[.]"

that Debtor's attorney was fully informed or that Debtor's reliance on this advice was reasonable absent such evidence, this argument (to the extent he is asserting it) is rejected.

To summarize, the Court finds that the Trustee met his burden of showing that Debtor transferred his share of the Arizona Property proceeds to his wife's bank account with intent to hinder, delay or defraud creditors. Debtor failed to offer evidence sufficient to rebut the presumption. Accordingly, the Trustee met all of the elements of his section 727(a)(2) cause of action.

### 2.      Denial of Discharge Under 11 U.S.C. § 727(a)(4)

Because the Court concludes that the Trustee met his burden of proving his claim under section 727(a)(2), the Court finds it unnecessary to discuss his claim under section 727(a)(4).

The Court considered all other arguments and finds them unpersuasive or unnecessary to discuss.

## IV.   CONCLUSION

For the reasons stated above, the Trustee satisfied his burden of proving Debtor transferred his property, within one year of bankruptcy, with intent to hinder, delay, or defraud a creditor. See 11 U.S.C. § 727(a)(2). Debtor is denied a discharge under 11 U.S.C. § 727(a)(2).

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated: July 29th, 2019.

/s/ Shon Hastings
SHON HASTINGS, JUDGE
UNITED STATES BANKRUPTCY COURT

27